082647 Consolidated 083281 083282 Bank of America v. John Harper How many parties are represented here this morning? How many parties will be arguing? Your Honor, my name is David Bleckenstaff for Bank of America, which is the trustee at the Hartley Harper Trust. I'll be principally arguing this morning. Mr. Campbell, Dick Campbell, who represents the income beneficiaries, would like to have a few minutes at the end of my initial remarks to say a couple of things. I don't think it'll take long. And we'd like to reserve, if we could, four minutes for rebuttal.  Thank you, Your Honor. May it please the Court, Counsel. Your Honor, it's the trial court's decision in this case concerning the termination date of Hartley Harper's trust. Counsel, I will ask you to speak up a little. I'm sorry. Let me try to do that. That's not an amplifier. That's simply a recording device. Okay. Thank you. Your Honor, it's the trial court's decision in this case concerning the termination date of Hartley Harper's trust should be reversed because it improperly changes the plain language of Mr. Harper's will. Mr. Harper provided that his trust would terminate 21 years after the last to die of all beneficiaries, herein named or described, who are living at the date of my death. The trial court read those words, all beneficiaries, to refer to only some of the beneficiaries in the will. And that decision would cause the trust to terminate in 2013 as opposed to 2031 or later, depending on when the measuring lives pass away. And his concern in ruling that way, what was it? The trial court's concern? Yes. I think there were two. What motivated him? Your Honor, I've been struggling with that. He did indicate that there was some sort of logical problem with choosing either one or four. It was not logical to choose one. That's what he said. And the way this procedurally went was there was an initial set of cross motions on one and four. And then the trial court said, well, I think three is really the one. And then there was a motion for three. What the trial court said about interpretation three and really why he could not read the language as written, I can pull out of the opinion two concerns. One of them was that the trial court seemed to be concerned about just the rule against perpetuities in general. Are we going to be running afoul of this? To me, that's not a concern that should motivate the decision because I think everyone in this case acknowledges that subparagraph five solves that problem. Let me ask you this regarding interpretation one and four. Does that concern dissipate? Does it go away regarding paragraph four possibly violating the rule against perpetuities if we go with one and four? Well, I think any of these interpretations would avoid a perpetuities problem. With five. With five, correct. With four. If his concern was choosing three because paragraph four might violate the rule against perpetuities, that would be true for interpretation one and four in the absence of paragraph five. Well, interpretation four, Your Honor, and this is what the remaining beneficiaries have said, is ignore subparagraph five. Just read that part of it out of the will and focus on four. Rewrite four so that it essentially contains a perpetuities provision, and that will be okay. Yeah, if the trial judge was concerned about subparagraph five not being sufficient, that would be a problem with one also. The difficulty with the trial judge's decision is subparagraph five isn't insufficient. It works. It succeeds in solving any perpetuities problem, and the remainder beneficiaries have never argued otherwise. Going back to Your Honor's question about what was motivating the trial judge, I think the other thing was that he was concerned that if the trust terminated under subparagraph five, that subparagraph four would be rendered meaningless, and that's the language that I'm reading from his order there. Okay. He seemed to think that if that's not the way, if the trust is going to terminate under five, then we don't really have a reason to worry about four, and, therefore, are we just reading language out of the will? The answer to that, I think, is twofold. One is subparagraph four does a lot of other things besides termination. It provides what's going to happen whichever way it terminates, but also subparagraph four remains a live termination provision under any reading, and that's because what it says is when the brothers line, when Hartley Harper's brothers line dies out, which we hope it doesn't happen soon but could happen today, if all those folks are in a train wreck today, the trust will terminate today, and subparagraph four is the paragraph that does that. That paragraph remains effective, and so it's not meaningless even under our reading. So I think either way the trial court was concerned, I think neither concern actually applies, and what happened was the trial court, as I said, took the termination period that Mr. Harper provided for, which was let's run this out as long as we can to my brother's line, and only when we hit a perpetuity's roadblock or they all die out should we terminate. He took that and cut it short by 20 or more years, which is an improper way to read an instrument. Your Honor, the remainder beneficiaries' positions in this case have changed over time, and I want to mention that because I think it's a danger of reading the document other than the way it actually is written. And you're aware that the position changing over time is an assertion made against the trustee? I am, and I'm happy to draw the distinction between the two, because what happened, I'm talking about in this very case, in the lawsuit when we've got a live issue, there have been different interpretations advocated, starting with, hey, the document's ambiguous, there are four different possible readings, we don't know what it is, that was the initial claim. And then it became we'll go with interpretation four, then three, now both three and four, and so they're saying that we should correct what they say is a mistake in the document and rewrite the will to correct that mistake to carry out Mr. Harper's intent, but they don't know which one it is, what the intent is. It could be interpretation four, or we could go 21 years later and it could be interpretation three. They're advocating for both of those. With respect to the concern Your Honor noted about historical interpretations of the document, Judge, there's not a full record on that because this was decided on cross-motion, so we don't have all of the evidentiary history of what I would consider extrinsic evidence. These are what people said over time about what the will means, and going back to 1933 is the earliest one. So we don't have a full record. What we can say is there were varying views of what it meant, including by the trustee, and I'll acknowledge that. The first time that the issue actually became ripe under anybody's interpretation in this case was in 1992, when the remainder of beneficiaries at least initially claimed that the trust should terminate. They didn't claim that at the time, by the way, but they claim it now. At that time, the bank said, we think we have to read the document as written. We think there's only one interpretation. That's what they now call interpretation one, and that's been our interpretation since then, not only during the litigation but before. That's been a consistent point of view. But on that score, I want to point out that the meaning that the parties ascribed to the document, whatever somebody thought it meant in 1930 or 1960 or whatever else, is not going to be controlling here. This was a case decided on cross motions. That's a case in which everybody on the trial court acknowledged there's no ambiguity in the document. So we don't get to what somebody else might have thought. Even if we were in an extrinsic evidence mode, we would be talking about not what the bank thought or what the remainder of beneficiaries thought, but what Harley Harper intended. And the only evidence we have of that is the will itself. I didn't mean to interrupt. I thought you were about to say something. No, I was just listening to you. And you haven't argued, but it seems to me that we should be looking to the testator's intent, and the testator's intent is what his document says, and that you read four and five together, not taking them apart. I couldn't agree more. I think that's exactly what we have to do. And Your Honor's right. Unless there's an ambiguity, in which case we have to go on a search for intent. It's just like a contract or any other written document. We follow the document. That's the intent that's effective. And we try to carry it out, and we try to carry out not only, you know, we don't take it apart, as you said. We take each provision and read them as a whole and see how they work together. And how they work together is, here, there are two ways in which this trust can terminate. Let me go to a little bit of the intent, and that concerns the remainder beneficiaries. The very existence of remainder beneficiaries might suggest that the intent of Mr. Harper was to leave something for them. And their concern is that if it runs much longer, there may not be anything for them. And is that an intent that really is supported by what's contained in the will, or was it simply a position he had to take? Eventually, whatever remains has to go somewhere, and it may as well go to them. But it really wasn't his overriding concern that they be benefited by the estate itself. I don't know if I'd say exactly that, Judge. He clearly intended to benefit them because he leaves the corpus, what we call the corpus of the trust, to them when it runs, at the termination date, whatever that may be. So I think they are legitimately beneficiaries. They are legitimately intended to take at that time. What I think we can read from the instrument, though, is because of the way it's set up, where subparagraph 4 says terminate when the brother's line runs out, and subparagraph 5 says run it as long as the law allows. And then if we hit a perpetuity violation, cut it off. What that says is we want to pay out to the income beneficiaries, this was the brother's line, for as long as we can under either one of those alternatives. And then we hand it over to the remainder beneficiaries. But I'm not suggesting that they're not intended to take at some point. It's just a question of when. And the concern I have with what the trial court did here is that the trial judge cut it off too soon, by a good margin. And so what that means is that the brother's line, whom Mr. Harper clearly intended to benefit, will be shorted. And that's not the way we should read it. I also have a question regarding something I'm unfamiliar with, and it's basically because we don't run across very many of these sort of cases, but the trustee came into court seeking to convert the trust in some manner, but I'm not sure what the consequences of that conversion are. Okay. Let me try to explain that. But I should say it doesn't directly to the trustee. Yeah, I understand that. Just so you know. So the case started because we were, so when you, let me step back a second. When you're a trustee and you've got both income beneficiaries who are receiving kind of, you know, it's as if they're receiving the interest on your checking account or something. They're getting whatever it generates. And then you've got the remainder beneficiaries who are going to take the principal, the corpus of the trust at the end of the day. There's a tension there in how you invest. So if I'm me and I want the money to be generating a lot of income, I'll put it all in a bond or something else that's going to generate a lot of current income, as opposed to investing in the stock market and hoping that I'll be better off 10 years from now, which may or may not work. But there's a tension between those two things. And so trustees have historically struggled with that and had a problem. The income beneficiaries are always saying, generate more income, and the other folks are saying, no, preserve it for the long haul and build that up. And those are in tension. The legislature helped out trustees a few years back. The provision isn't very old. And said, what we'll allow you to do is to convert trusts that are in this mode, where there's an income beneficiary and a separate group of remainder beneficiaries, into a trust where we'll let you invest for the long haul, which in theory will benefit everybody. And instead of, but you won't have to be worried about income. We'll just skim a certain percentage off the top, whether it's technically income or part of the principal. We're not going to worry about that. We'll give the income beneficiaries, say, 4% a year. And so that allows you to invest in a way that helps everybody, hopefully, the way you might invest your own assets if you're a long-term investor. But the income beneficiaries aren't hurt by that. They're just getting a certain amount every year off the top. That's how we started. And what happened is this issue that's before the court today was raised as a counterclaim. One of the things that we had alleged was, and it was significant to why we were going to court and seeking to convert to this what's called a unit trust, was how long is the trust going to run? If it's going to terminate in a couple of years, there's not a lot of sense to go through the process of converting it over to a different form. It's just not justified. So we allege, look, this thing's going to terminate way off in the future, Interpretation 1. The remainder beneficiaries came back and said, no, no, no, there's an ambiguity and all that. I will note, although they initially said that Interpretation 4 should apply, which would have terminated the trust in 1992, they had never taken that position in a court proceeding or anywhere else before 2007 when we filed our case. So it was kind of a late-to-the-game interpretation. But I hope that addresses your question. Yes, it does. There are a couple of things I want to bring up. First, you said that the legislature helped out the trustees by providing for this. I should say it helps beneficiaries, too, I think. It helps the functioning of trustees. Yes. And there's also something else in the legislature that passed the legislature regarding dealing with the rule against perpetuities. Yes. And I saw a very remarkable similarity between Paragraph 5 and the statute that deals with the rule against perpetuities. And the question is, did the existence of the statute and its similarities to Paragraph 5 come up during the course of arguments in the circuit court? I have to confess I'm not sure whether it did or not. But the reason that that issue comes into play is that there was a claim by the remainder beneficiaries. I think it did because the reason it matters is there was a claim that, hey, these savings clauses, this concept of a savings clause, there's something untoward about that or there's something that they should be given less weight than any other provision of the will. It's just boilerplate. It's not really seriously considered. And, you know, who would do this? And so we addressed that by pointing out that, number one, there's a statute that adopts a very similar provision as a default rule, basically. Right. If somebody doesn't cover it in their trust, the statute would kick in. And it's very similar, as Your Honor pointed out. So we said, you know, this isn't anything out of the ordinary. We also noted that there are a variety of kind of form books, practitioners' guides, commentary, everything else that says, look, this is the way you handle this situation. You've got a rule against perpetuities, which is a pretty harsh common law consequence. Hey, is this trust going to be invalidated? Is there going to be a problem? Back in 1932, I don't think the statute that we're talking about was enforced. So, you know, what people did was what Mr. Harper did, which was, look, we're going to let this run on as long as possible, but, boy, I don't want to run afoul of the rule, so I'm going to put this provision in and cover that possibility. And that's what it's there for. And it's not that it doesn't have meaning or that it was just a throwaway. It's real. It was intended to avoid a potential problem. I think, based on this case, I see the movie Body Heat in a different light. Well, go ahead and conclude because we're going to have to give time to other counsel. I understand, Your Honor. I think I've covered basically what I wanted to cover. I would just say the will is unambiguous. You haven't heard otherwise from anybody else because we all move for summary judgment. It doesn't violate the rule against perpetuities as it's written, and it should be enforced that way without additions or subtractions. Thank you very much for your patience. Mr. Campbell? Good morning. May it please the Court, I'm Richard Campbell, and I'm here to speak on behalf of my clients, the income beneficiaries. The income beneficiaries agree in every particular with the argument made by the trustee here and in the joint briefs we filed in this matter. However, because they are the ones who are severely adversely impacted by Judge Mackey's decision to rewrite this unambiguous will, they thought it only fair that they be given a very brief opportunity to be heard today, and they asked me to speak to you on their behalf. The will, I'm going to take that opportunity to demonstrate to you that the will, as written, is perfectly clear and at the same time carries out the intent of the testator, Mr. Harper. Now, Judge Mackey expressly found at page 3 of his opinion that it was Mr. Harper's intent to produce income for his blood relatives as long as possible. Nobody disputes that. Now, determining who Mr. Harper's blood relatives are is uncomplicated. Mr. Harper had no children. He had two sisters. Neither of them had any children. He had a brother who had two children. Those two children, therefore, of course, were Mr. Harper's niece and nephew. That was his bloodline. That was who he decided he wanted to provide for as long as possible. That was accomplished by writing and drafting paragraph 4 of Article 3rd of the will. What paragraph 4 says in essence is, none of the remainder beneficiaries shall take anything until the death of my wife, my brother, my niece, my nephew, and their descendants. Those descendants are my client's income beneficiaries. One of them, Nancy Harper, is in court today. So it was his intent to benefit those income beneficiaries for as long as possible. No dispute about that. Now, to assure that the will did not violate the rule against perpetuities, as Judge Lampkin pointed out, there was an Article 5 draft, the Savings Clause. The drafter of the Savings Clause chose as the measuring lives in paragraph 5 all beneficiaries described, named, or described in the will. Now, why is the phrase described important? It's important because it carries out the intent of Mr. Harper, the testator. It does so because those described in the will are his marital relatives, his non-bloodline relatives. And among those were three relatives with the longest potential longevity, three grandchildren of his wife's sister and his wife's brother, who at this time, in 1932, were 3 years old, 8 years old, and 14 years old. So it was his intent to refer to them as measuring lives to further the intent of providing income to his bloodline as long as possible. And that's precisely what happened. So what we have here, and incidentally, those three are still alive. Each of them is still alive. Wonderfully. Wonderfully for my clients because that means the trust is still alive and it doesn't terminate until 21 years after the death of the last of those three to die, thereby explicitly furthering the express intent to provide income to his bloodline as long as possible. Now, when Judge Mackey rewrote the will, he just ignored that intent. Even though he found that that was the intent, he somehow unaccountably ignored it and was unable to properly account for it. That was error. That should be rejected. Moreover, I think as a matter of the policy ramifications here, I think this Court should be a little careful about allowing a circuit court judge to take a will that everybody agrees is unambiguous on its face, start shifting clauses from here to here to here to comply with what his interpretation is. That's not what wills are about. They're about, as Judge Lampkin said, what the intent of the testator was. Here the clear intent was to provide for his bloodline as long as possible. The will does that. It does not violate the rule against perpetuities. And that's what this Court should hold. Thank you for giving me the time. I appreciate it. Thank you. May it please the Court, my name is Brett Nolan, and I represent a group of 53 remainder men and women who have waited over 75 years to receive the corpus of a trust originally created by Hartley Harper in 1932. I ask this Court to affirm the judgment of the circuit court of July 25, 2008, finding summary judgment in our favor. And I want to begin by addressing Your Honor's initial question to counsel, which is what were the circuit court's paramount concerns? And I think there are two. First of all, Judge Mackey assumed that Hartley Harper did not intentionally create a rule against perpetuities violation in the will. And second, Judge Mackey assumed that Hartley Harper did not want subparagraph 4 to be meaningless. And actually, what I mean by that is Judge Mackey did not want the termination provision of subparagraph 4 to be rendered meaningless. What I mean by that is that the first sentence of subparagraph 4 identifies specifically the people who will be, or the manner in which the trust will be determined, and that is the wife, the brother, the niece, and the nephew. If you take Appellant's argument to its logical conclusion, and that all means all, then you would essentially be ignoring that. That subset of people specifically identified as when these people die, the trust terminates. And so I think those are the two paramount concerns that Judge Mackey had. Now, interpretation number 3 successfully deals with both of those concerns, and interpretation number 4 also successfully deals with those concerns. Interpretation number 1, however, I think flies directly in the face of those concerns. What of the language in subparagraph 4 that addresses all descendants? And certainly that goes against your reading that only those individuals that were alive at the time were the measuring bodies. Exactly. And that goes back to the first paramount concern, which is that Hartley Harper did not intentionally create the rule against perpetuities violations. And therein lies the violation, where it says all descendants of the niece and the nephew, and it doesn't say who are lives and being at the time of my death. Bingo, that's where you have the violation. So that's what Judge Mackey's narrative is. You have a potential violation. Yes. You have a potential violation that could be saved by the next paramount. Yes. If you read them together. Yes. But the fundamental concept is that as soon as there is a violation of the rule against perpetuities, if it could be a violation, it is a violation. And as I said, interpretation number 1, I think, violates both of those concerns. I want to deal first with interpretation number 3 and then briefly talk about 4 and 1. I think there's support for Judge Mackey's decision to uphold interpretation number 3 for two main reasons. One, Your Honor mentioned before, the settler's intent. And the other is the fact that a court is perfectly within its province, a trial court as well as this court, is perfectly within its province to add or delete or transpose language of a trust or a will, if doing so will uphold the settler's intent. Let me first start with a couple of clues from the trust that support Judge Mackey's interpretation, that the trust should terminate in accordance with that first sentence of subparagraph 4 rather than all beneficiaries in the savings clause of subparagraph 5. The first clue is the very concept of a measuring life. If you look at subparagraph 4, you have a sense of Hartley Harper first specifically identifies the subclass of people he wants as remainder beneficiaries. Let me stop you right there, counsel, because the concept measuring life only comes into play when we're addressing the rule against perpetuities. It doesn't come into play when you're concerned with, you know, the proceeds of an estate going to a certain party. And so the measuring life itself doesn't have to be in paragraph 4. It could be in the savings clause of paragraph 5 to extend the trust as long as possible. Isn't there a case law that says the measuring life doesn't even have to be a beneficiary under the? That's absolutely right, Your Honor. But just because you can do something doesn't mean it's logical to do it. And I think that's what Judge Mackey focused on. Is it logical that you'd identify these people by name, my wife's daughter, grandson, and sister, in one breath? I want these people to take the corpus of my trust. In the very next breath, subparagraph 5, say, except for the fact that you're going to be a measuring life. And we know what happens then. By definition, anyone who is a measuring life is never going to receive a dime from this. And the specific facts of this case are interesting. Because one of those remainder beneficiaries, F.J. Floracasterline, in 1932, as counsel stated, had three small children, or had three children who, in turn, one of whom had three small children. So F.J. Casterline, who is a remainder beneficiary, actually had grandchildren at the time that Hartley Harper drafted this document and then died. So not only would interpretation number one lead you to say, Hartley said, I want these people to take. But not only are they never going to take, their children are never going to take. Their grandchildren are never going to take. And it's going to be 21 years after the death of the last grandchild that will take. I think that's illogical. And I think Judge Mackey's decision focused in on that. When the claim is made that a certain position is illogical, it causes me to think of all the dissents in the appellate court decisions. And oftentimes, both sides, the majority and the dissent, contend that their position is the logical one. And there's room for disagreement. So I'm not sure that logic itself should be the driving force of a decision or of an interpretation of a will. It should be what we can divine from the language itself. I agree with that, Your Honor. I agree that there are limits to that logical argument. And so that leads me to the next clue that I think goes from logic to what's on the page. And that's further down in subparagraph four. And specifically, there's a section in which it's halfway down subparagraph four. And this relates to Hartley's sisters, who we have not talked about yet today, but I think have a clue to Judge Mackey's thinking. That provision provides for- Let's address that point that you just raised, what Judge Mackey was thinking. And my question to counsel was simply a point of information because our standard of review here, as we all know, no deference at all to Judge Mackey's reasoning or his decision that something else was more logical. Again, agreed. But I think it provides a basis for this Court, standing on its own, to agree. And so I want to direct your attention. It's a provision that provides as follows. Quote, I furthermore direct that if at the time of the said distribution of the trust estate, here and above, and this paragraph provided for, my trustee retains in its hands any part of the principle for the purpose of thereafter raising the annual payments to my said sisters. In plain English, what that means is if the trust terminates during the time that Hartley's sisters were alive, the trustee should hold back part of the principle from the remainder beneficiaries in order to fund these gifts to his sisters. And let me back up. I'm sorry. Both his sisters, he gave gifts, twin gifts of $1,500 per year, every year for the rest of their life. And that money was to be paid out of income. And so Hartley himself contemplated, well, what happens if this trust, if the trust terminates quickly, if the first sentence of subparagraph 4 kicks in quickly and then the corpus is supposed to go to the remainder beneficiaries? Well, then how are my sisters going to get their $1,500 a year? He realized that this thing could end very quickly. Which suggests that a lot of thought went into this creation of a will and a trust, and which suggests that everything else should be given some credence as well. I agree, except for the fact that in subparagraph 4, even a first-year, well, maybe not a first-year property student, can find the violation of a rule against perpetuities. But I think the argument about his sisters is even more powerful when you realize how old they were at the time. They were not quite senior citizens, but 59 and 64, respectively. So in the flower of their genes, they were not quite senior citizens. And yet, despite their fairly young age, he realized that they could live, that the trust could terminate before their lives ended. I think that's an interesting clue. Let me talk a little bit about Interpretation 1. Let me skip to that and talk about some of the failings that are inherent in Interpretation 1. Interpretation 1, what the appellants ask this court to adopt, it asks this court to find that Hartley essentially wanted to disinherit the very people he identifies as remainder of beneficiaries. That's the paramount issue, and I've addressed it. I mean, that's the question I raised to the trustee, and he told me that was a bit strong, and maybe it is strong because even if the trust continues, I got the impression that there will be a corpus to the trust even after 21 years after the death of the last deceased. True. That's absolutely right. So it isn't a matter of disinheriting anyone. Well, it disinherits the people that he identified, specifically by name, F.J. Kasterlein, his sister's daughter and sister's grandson, who were alive in 1932. That's what I mean. I don't mean to say the remainder of beneficiaries, but that leads me to my second point. If you adopt Interpretation 1, you assume or you find that Hartley wanted to exert what I'll call dead hand control over his assets, control from the grave, for more than 100 years, notwithstanding the fact that he's identified very clearly that he wanted these particular people to take. It also, the effect of Interpretation 1 is also, I think, antithetical to the trust, and that is the position that we're in now is we have two income beneficiaries who, just two, who are receiving income, and we have this giant class of 72 remainder beneficiaries. And Appellants essentially asked this court to believe that Hartley Harper wanted so few to take in the face of so many and who have been waiting so long and could grow. So let's properly place these two groups in the right categories. And the category being blood relatives versus non-blood relatives. Where do the remainder beneficiaries lie? They are non-blood. And the others? They are his wife's family. And the others? And they are his wife, so not blood. Okay, not blood either. But also his brother and the brother's two children. I take your point, Your Honor. But at the same time, contrast the type of gift, income versus residuary, the principle. The principle, at this point, is in excess of $7 million, I believe. Not insubstantial. It was very substantial in 1932. It was, I would disagree. And just so it's clear, the income that is being dispersed from the corpus has remained fixed? Has it remained fixed? No, no. It fluctuates with the amount of. But it doesn't threaten the. No, it does not. But to the extent that someone would classify this as, well, it's an in-law gift and classify it like that, I would disagree, given the size of it. And I think it defies belief that Hartley wanted someday in the future, which could be the year 2040, because there are three more people who, under interpretation number one, have to die, and then 21 years thereafter. It could easily be 2040. And so we're looking at in excess of a century of control, and before the corpus is then divided 72 ways or more. It could be many more people than that. And I don't think that makes sense. And then the final reason that interpretation number one, I think, is incorrect is that it's predicated on the notion that a court can't rewrite, rewrites the wrong word, to reconcile conflicting provisions. The case law that we've cited stands for the proposition that a court can add, subtract language, delete whole paragraphs. We cited those cases, Ranger and Hampson and Schwartz. Let me ask you about those cases. I was going to say, if the court believes it's ambiguous, you can do that. If it's not ambiguous, you're not supposed to do it. Or if we rule that it's not ambiguous, then you don't add or subtract. You read it as you believe. Correct. Or even going a little further, if the reading leads to an observed result, or a result clearly contrary to the intent of the person that established the trust, then we can understand it. But if there is no danger to that, then the inclination to modify the language is lessened substantially. I agree with that. And that's why I think Judge Mackey, the hallmark of his decision was, what is Hartley Harper's intent? How can we glean that intent from the four corners of the document? And he found, as a result of the fact that the procedural posture was competing motions for summary judgment, or rather just a single motion for summary judgment, he did find that it was an unambiguous document. I'll take that as a segue to the issue of whether the interpretation one is properly before us, which you've raised in your brief. But I'm not sure whether you really need to discuss that, because obviously the motions to dismiss were denied. Yes. And our threshold jurisdictional point was just to make the point that to the extent that appellants are trying to bootstrap that denial of the cross motions for summary judgment, that's improper. But I grant that to really make an intelligent decision about interpretation number three, this Court needs to consider the other interpretations. And I understand that. And really, there would be no purpose in sending it back, given that it was cross motions and it was a question of law and we should be able to resolve that ourselves as opposed to sending it back. Absolutely. We don't agree with interpretation number three. That's absolutely true. This Court can uphold interpretation number three or it could adopt an interpretation of its own. And still further regarding the cross appeal, given that the circuit court chose interpretation number three, which put off the termination date into the future, is there any basis for a claim of damages in light of interpretation number three being adopted? Well, Your Honor, I would say that the damage that my clients have suffered is – Let's say legal damages. Let's say financial damages. Other than – well, the main component of damages would be the cost to them of having to fight this fight, having to fight a trustee who – Yeah, you know what it is. It's almost a fight that they brought upon themselves. The trustee didn't seek to – Well, Your Honor, attached to the counterclaim are a series of memos and documents from the trustee that are, I think, fairly identified that there's a possible issue. And you see the risk if we were to expand illegal grounds for a counterclaim on attorney fees expenditures only, which would be, I think, cutting new precedence. I do. I do. But the counterclaim was essentially brought to try to remedy the problem of – if a trustee knows for a long time that there is a problematic trust and yet doesn't file for a trust construction suit, is that a breach of fiduciary duty? We contended that it was. It was ruled against us on summary judgment. We think that was an error. We think that given the fact that the trustee has urged Interpretation No. 1, we've urged Interpretation No. 4, and the court adopted Interpretation No. 3, I think that in and of itself is a pretty good indication that construction should have taken place a lot earlier than it did. And it would have potentially saved a lot of heartache, especially if this court were to adopt Interpretation No. 4, which is that the trust should have terminated it in 1992, you know, 18 years ago. The damage there, I think, would be huge. All right. If there's no other questions, that concludes my arguments. We ask that this court affirm the July 25th order as it relates to Interpretation No. 3 and to reverse as it relates to Count 2 of the counterpoint. All right, Mr. Nolan, I just want to make sure, Claire, that you're not on the brief. No, I'm not. Okay. Thank you. Thank you. Let me just respond briefly, Your Honors, to what Mr. Nolan had to say. First, he said that rewrite was not the right word. It's exactly the right word. It's exactly what the trial court did. It's exactly what the remainder beneficiaries asked the trial court to do and are asking this court to do. They say that if we read subparagraph 4 separately from subparagraph 5, we have a violation. But counsel acknowledged that if we read them together, we don't. And what that means is that they're acknowledging that our interpretation, which reads the will as written, works. They want the court to rewrite the will even though it's ambiguous. Excuse me, it's unambiguous. And it doesn't violate the rule against perpetuities by Mr. Nolan's own admission today. And then he said if it could be a violation, it is. That's not so. The rule is we don't stop after it's stopped partway through the document. Read the whole document. And subparagraph 5 addresses any perpetuities problem. Mr. Nolan referred repeatedly to clues in the document that he said indicated an intent on the part of Mr. Harper. I'm not sure that we ever have seen or heard what that intent boils down to, what it is. And as I said, they've advocated two different interpretations that are 21 years apart. So I'm not sure what the intent is. But he seemed to focus on certain people named in subparagraph 4. And he said, well, these people were intended to take as the remainder beneficiaries. I don't think so. And I'll point you to the language. What the document says is when the trust terminates, the assets will be paid to those folks. Or if they're dead, their descendants. They all died. They're all dead today. So even under the trial court's interpretation, which Mr. Nolan is advocating, they're not going to take. So to say that they are the determinative intent of Mr. Harper really doesn't support interpretation, even interpretation 3. What Mr. Harper provided was that's the family line that the remainder interest is going to go down, but not to some particular people who had to take. The fact that the will or the trust could terminate during his sister's lifetime, sure, it could have. It might not have. And he provided for both possibilities. It could terminate in either way. Those things are not, they don't argue for one interpretation over the other. The bottom line, Your Honors, is that Mr. Harper's will works just fine. The way he wrote it, and it should be enforced the way he wrote it, without additions, without subtractions. So we would ask that the trial court be reversed. Thank you very much. We thank counsel. And the case will be taken under advisement.